UNITED STATES v. MERCHANTS' & MINERS' TRANSP. CO. et al.

(Circuit Court, S. D. Georgia, E. D.    March 8, 1911.)

Nos. 379, 380, 381.

1. GRAND JURY (§ 8*)—SELECTION—STATUTES—CONSTRUCTION—DIRECTION OF JUDGE.

Rev. St. § 802 (U. S. Comp. St. 1901, p. 625), provides that jurors shall be returned from such parts of the district from time to time as the court shall direct, so as to be most favorable to an impartial trial, and so as not to incur unnecessary expense or unduly to burden the citizens of any part of the district with such services. *Held*, that where, prior to the return of certain indictments, the District Judge appointed a jury commissioner, and directed such commissioner, with the clerk, to place in the box as eligible for jury service the names of 550 persons residing in the Eastern division of the district, directing the number to be drawn from each county, such order was not objectionable as substituting the discretion of the judge for that of the commissioner, nor because the representation provided in the order was not in accordance with the population of such counties.

[Ed. Note.—For other cases, see Grand Jury, Cent. Dig. §§ 16–20; Dec. Dig. § 8.*]

2. JURY (§ 58*)—DRAWING JURORS—STATUTES—REPEAL.

Rev. St. §§ 802, 804, 808 (U. S. Comp. St. 1901, pp. 625, 626), regulating the drawing of jurors, was not repealed by Act Cong. June 30, 1879, c. 52, 21 Stat. 43, relating to the same subject.

[Ed. Note.—For other cases, see Jury, Dec. Dig. § 58.*]

3. CRIMINAL LAW (§ 280*)—PLEA IN ABATEMENT—INCOMPETENCY OF GRAND JUROR.

Where a plea in abatement to an indictment, because of alleged disqualification of a member of the grand jury returning the same, did not allege that the juror was incompetent because he was a member of the board of education at the time he was summoned, as required by the statute, it was insufficient.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 645–651; Dec. Dig. § 280.*]

4. CRIMINAL LAW (§ 280*)—PLEA IN ABATEMENT—REQUISITES.

A plea in abatement to an indictment, alleging that an order of the judge directing selection of a certain number of names from each of several counties, from which jurors were to be drawn, constituted a manifest injury to accused, without showing how accused was injured thereby, was insufficient.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 645–651; Dec. Dig. § 280.*]

Indictments against the Merchants' & Miners' Transportation Company, against the Atlantic Coast Line Railroad Company, and against the Seaboard Air Line Railway Company for violating the interstate commerce act as amended. On plea in abatement, alleging error in the drawing of the grand jury. Overruled.

See, also, 187 Fed. 363.

The plea in abatement to the indictment against the Merchants' & Miners' Transportation Company is as follows:

And now comes the above-named defendant corporation, the Merchants' & Miners' Transportation Company, and pleads in abatement to the indictment in the above-stated cause, filed in the above-mentioned court, and says that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the grand jury which found the said indictment was illegally constituted and was not a lawful body, in this: The act of Congress approved June 30, 1879, and governing in this matter, requires that the box, from which the names of grand jurors in said court must be drawn, shall contain not less than . three hundred persons, and that these names shall have been placed therein by the clerk of the said court and the commissioner appointed by the judge thereof, which commissioner shall be a citizen of good standing residing in the district in which the court is held and a well-known member of the principal political party in the district in which the court is held opposing that to which the clerk may belong, and that the said clerk and the said commissioner shall each place one name in the said box alternately without reference to party affiliations until the whole number required shall be placed therein. That on the 30th day of April, 1910, the Honorable Emory ' Speer, United States District Judge, and presiding in said Circuit Court, passed an order in said Circuit Court touching the jury box for said court and its revision, of which the following is a copy:

"In re the Jury Box.

"Order Appointing A. S. Anderson, Esquire, as Jury Commissioner and for Revision of Jury List.

"It appearing to the court that the jury box is in need of revision, it is ordered by the court that A. S. Anderson, Esquire, be and he is hereby appointed jury commissioner, and that he, together with the clerk of this court, proceed, as soon as may be practicable, conformably to law, to revise the jury box of said court, placing therein not less than five hundred and fifty (550) names of persons eligible to jury service from said Eastern division of said Southern district of Georgia in the following proportions, respectively, from the several counties of the district:

| | | | |
|---|---|---|---|
| Chatham county | 75 | Glynn county | 37 |
| Effingham county | 37 | Appling county | 19 |
| Screven county | 38 | Liberty county | 19 |
| Jenkins county | 37 | Bryan county | 18 |
| Emanuel county | 59 | McIntosh county | 19 |
| Bulloch county | 60 | Camden county | 18 |
| Montgomery county | 37 | Wayne county | 19 |
| Tattnall county | 38 | | |

"In open court, this 30th day of April, 1910.

"Emory Speer, United States Judge."

That the said clerk and the said A. S. Anderson proceeded in accordance with the said order just quoted, and because of the said order, and placed in the said jury box exactly five, hundred and fifty names, distributing them as directed by the said order, and placing in the jury box the number of persons, residents of the counties mentioned, as directed by the said order, and no more and no less; that is to say, the said clerk and the other jury commissioner placed in the said box, under and because of the said order, the names of seventy-five jurors from Chatham county, the names of thirty-seven from Effingham county [naming each county and number as above], making five hundred and fifty names, and they placed only these names, no more and no less, in the said jury box. That all of the jurors finding the above indictment against this defendant were taken 'from the said jury box so made up, and the said clerk and the other jury commissioner, in making up the said box and in putting the names therein, felt bound by the said order and followed the same.

This defendant says that, under the law, the discretion as to the numbers and residence of jurors to be placed in the said box was with the said clerk and the other jury commissioner, except that the law required that they place in the box the names of not less than three hundred persons, whereas the said order directed that they place therein not less than five hundred and fifty names, and in this respect the said order, and the course taken thereunder by the said two jury commissioners, made the constitution of said grand jury, and the making up of the said jury box, illegal and contrary to the statute. Defendant also says that, under the law, the

discretion as to the selection of jurors resident in the said Western division, and as to the number from any county thereof to be placed in the box, was with the said clerk and the other jury commissioner, and not with the judge of the court, except that, under the act of June 30, 1879, the said judge did have the discretion to order the names of jurors to be drawn from the boxes used by the state authorities in selecting jurors in the highest courts of the state. The said judge, however, did not exercise this discretion, in that he did not direct that the names be drawn from the boxes used by the state authorities, but by the said order substituted his discretion, as to the number of names to be placed in the box and as to their manner of distribution among the counties in the said Eastern division, for the discretion put by the law in the jury commissioners, and the said judge, by the said order, so proportioned the numbers as to require that 550 names be placed in the box, and that they be distributed among the counties named as required in the said order.

Defendant further says: That, by the census of the United States taken in 1910, the said counties have the following populations, to wit: Chatham county, 79,690; Effingham county, 24,125; Screven county, 20,202; Jenkins county, 11,520; Emanuel county, 25,140; Bulloch county, 26,464; Montgomery county, 19,638; Tattnall county, 18,569; Glynn county, 15,720; Appling county, 12,308; Liberty county, 12,924; Bryan county, 6,702; McIntosh county, 6,442; Camden county, 7,690, and Wayne county, 13,069. That the distribution directed by the said judge and observed by the said jury commissioners, under his said order, was disproportioned to the populations of the said counties, and that, if the populations had been observed, Chatham county—the county in which it is proposed to try the said cause—would have had in the box a much larger number of names, as will appear from the populations just stated. Chatham county has more than one-fourth of the population of all the counties in the division, and yet only seventy-five names from Chatham county were put in the box, and only one resident of Chatham county was on the grand jury of twenty that found this indictment. That no county in the division, other than Chatham, possesses any advantage over Chatham in the matter of the qualification of jurors, or other competency or fitness, and Chatham county possesses over the other counties large advantages, not only as to population, but as to property and commercial importance and prestige. That Chatham county is largely a commercial county, and the jurors living in the said county would possess special qualifications for the trial of issues involved in the present cause. It is the only county in the Southern district of Georgia in which defendant has an agent.

Defendant says that for the reasons stated the grand jury box was not made up in the manner pointed out by law; that the said grand jury, which preferred the said indictment, was illegally constituted, and the said proceedings and the said indictment were and are unlawful and should be abated. Defendant says that the said order and the course taken under its mandate by the said jury commissioners deprived this defendant of its rights under the statute of the United States, and its right to the exercise of the discretion of the jury commissioners, and tend to its manifest prejudice, and that this defendant is entitled to a grand jury made up as required by the said statute, and in accordance therewith, without discrimination as to any county in the division, and without any curtailment or impairment of the discretion of the said jury commissioners, and without any direction from the court as to the persons to be selected, or the residence of said persons, or the number to be placed in the box. Of all of which rights defendant has been deprived by the said order.

Wherefore it prays that said indictment be abated and quashed, etc.

Merchants' & Miners' Transportation Co.,

Daniel H. Hayne,                                   Per L. M. Erskine, Agent.
Adams & Adams,
    Attorneys.

A further ground was added, by amendment, in which it was alleged that one of the grand jurors was a member of the board of ed-

ucation of the county of his residence, which disqualifies him by the state law from serving on the grand jury in the state court, and that he was therefore disqualified from serving as a grand juror in the United States court.

Alexander Akerman, Asst. U. S. Atty., and W. M. Toomer, John H. Marble, and S. H. Smith, Sp. Asst. U. S. Attys.

Samuel B. Adams, A. Pratt Adams, and Daniel Hayne, for defendant Merchants' & Miners' Transp. Co.

Alexander Hamilton and Peter W. Meldrim, for defendant Atlantic Coast Line R. Co.

Anderson, Cann & Anderson, for defendant Seaboard Air Line Ry. Co.

SPEER, District Judge (orally). [1] I am quite sure that in directing the revision of the jury box, or boxes, by the order to which exception is taken in this plea in abatement, the court intended nothing save to distribute generally throughout the district the labor and burden of attending here, and to secure impartial and upright jurors. It will be observed that the commissioners were directed to select the jurors from over the whole division. The counties composing the division, with their populations, are as follows:

| | |
|---|---:|
| Effingham | 24,125 |
| Screven | 20,202 |
| Jenkins | 11,520 |
| Emanuel | 25,140 |
| Bulloch | 26,464 |
| Montgomery | 19,638 |
| Tattnall | 18,569 |
| Glynn | 15,720 |
| Appling | 12,308 |
| Liberty | 12,924 |
| Bryan | 6,702 |
| McIntosh | 6,442 |
| Camden | 7,690 |
| Wayne | 13,069 |

This aggregates 220,513 persons residing outside of the limits of the county of Chatham, not quite three times as many as live in Chatham. our great seaport, which can properly boast of 79,690 inhabitants. There is, however, no rule that I am aware of relating to the selection of the jury, which is arithmetical in its character, unless it is that which fixes the minimum to be placed in the box. There shall be not less than 300. The maximum provided for by my order is not less than 550. Five hundred and fifty is not less than 300, unless my arithmetic is in error. So there is no violation of the law in that respect. Then, if there was a discretion vested in the court, it is not impossible that the court, in its exercise concluded that not all of the persons living in these various counties were proper for our jury body.

In this county of Chatham there is a noble citizenship. Nearly every juror at this term of the court, I believe all without exception, have been citizens of Chatham county. I am not only proud of their

appearance, proud of their character, but proud of the work that they have done. I intended no reflection upon them, or upon the other good people of Chatham county; but I reflected that there were a good many people here who are not naturalized. We have some 70 to-day knocking at the door of this court seeking naturalization. I do not know how many more there are. Then, too, in my rides about the beautiful environments of Savannah, I meet a number of simple and no doubt kindly people, dwelling in homes which to my mind resemble Henry Grady's Patchwork Palace. These are mainly constructed of pieces of rusty tin which have been stripped from the roofs of the city, on those occasions (to quote Goldsmith, in the "Deserted Village," a passage relating to this neighborhood)

> "When the mild tornado flies,
> Mingling oft the ravaged landscape with the skies."

They talk in a dialect which is not understandable by those who know only the English language. And not infrequently in the performance of my extended duties in this community I have been obliged to call an interpreter to interpret their 'English' as it is spoken. It is really a Gullah dialect, which has come down to them from their tribal forebears on the Dark Continent, and which cannot be understood by the court. I believe some of them are irreverently and carelessly alluded to by Vox Populi here as "Geechee coons." They are quite numerous, and surely they are not to be regarded such good jurors as the upright, clear-sighted, fearless Americans of the ancient American stock, many of whom live here, and many more of whom, in proportion to the population, reside in those counties sometimes called "the interior" from which these jurors have been selected.

Now the object of the court was to get jurors from all the counties of the district. We have not always been able to do that. From the time of my appointment as judge, almost down to the present time, we have been obliged to omit certain counties. We now at times draw the jurors from every county in the Southern district of Georgia. Formerly certain communities had a cheerful way of shooting at our officers. I remember a case in which Mr. Adams was for the defense, and his client sat on the side of the road with a loaded shotgun and fired at a party of revenue officers riding along in their buggy. He dropped the mule, but missed the officers. Now we did not for some time thereafter select any jurors from that immediate locality. We regarded them as having perhaps some objection to the court, if they felt so hostile towards the officers.

Then, too, in other counties in the Western division there were greater difficulties. These culminated in the famous case of United States v. Hall et al. (C. C.) 44 Fed. 883, 10 L. R. A. 323, for conspiracy and murder. The defendants were brought to trial, to be punished conformably to law for the murder of one of the most charming and amiable men I ever knew, John C. Forsyth, who was the agent of Mr. Norman W. Dodge, of New York, and who was

seeking to protect the 300,000 acres of land owned by that gentleman in that section of the state from the depredations of a lawless band of forgers and conspirators. Finally this deadly conspiracy resulted in a duel and desperate encounter between one of our deputies and the surviving leader of the conspiracy. We did not draw jurors from those counties at that time. But so much have the conditions improved that now there is not a single county in the Southern district of Georgia to which we cannot safely go for jurors who will enforce, not only the laws of the state, but the laws of the United States.

The first Congress which met after the adoption of.the Constitution enacted this law:

"Jurors' shall be returned from such parts of the district, from time to time, as the courts shall direct, so as to be most favorable to an impartial trial, and so as not to incur an unnecessary expense, or unduly to burden citizens of any part of the district with such services." Rev. St. 802 (U. S. Comp. St. 1901, p. 625).

Many of the men who framed the Constitution, which was adopted but two years before, were members of that Congress. They enacted that law and according to paramount decisions of our courts it has been the law from that day down to the present time, and is the law to-day. It has just been re-enacted in the Judicial Code (section 277), otherwise called the "Moon Bill," approved March 3, 1911. It is the law which has governed me in the 26 years of my service on the bench. It was challenged—it is true, very vigorously challenged—in the famous trial of the United States v. Greene and Gaynor (D. C.) 146 Fed. 776, charged with conspiracy to embezzle the funds which Congress had appropriated for the benefit of the people. This court, commenting upon it in that case, said:

"This being the law, the court, not on its own initiative, but, as it will appear from the record and otherwise, having been requested more than once by the district attorney for the exercise of this power in order to obtain an impartial jury, determined to cause the jurors to be selected from that portion of the district most remote from the scene of the transactions involved in this controversy. The counties from which the jurors are selected are among the most thrifty, enlightened, and progressive in the state of Georgia. They are the counties of Lowndes, Thomas, Decatur, Berrien, and Brooks as they then existed. The court had long experience of the intelligence, capacity, uprightness, and patriotism of jurors taken from that section of the state. They had long composed a part of the jury body at many terms in the courts of Savannah. How, then, was this jury to be obtained? Since a new jury must be had, we could not select jurors from the small Eastern division we now have, because it had been prescribed by law, and the prisoners were entitled to be tried in the district as previously ascertained. The law, familiar to all, requires that the jurors shall be returned by commissioners. One of these must be the clerk of the court, and the other a prominent member of the principal political party opposing that to which the clerk belongs. The home of the clerk is Savannah, and since the court had determined to draw the jury from the extreme southwestern counties of the state, how necessary was it that the additional commissioner should be selected from a locality where residence had given him long acquaintance with the people, and who was otherwise by intelligence and character fitted for the selection of pure, impartial, upright, and intelligent men to perform the grave service to the public and to the prisoners who were involved in this prosecution."

So what is complained of here was done there. It was challenged by exceptions of the defendant. It was passed upon by the Circuit Court of Appeals, and my action was affirmed. It is perhaps the latest and most conclusive deliverance upon the subject. The fact that the Supreme Court of the United States, after careful inquiry, refused to grant even a certiorari to carry up the record, discloses how little regard that great tribunal had to the complaints of error which were numerously made in that case.

But this is not the only case in point. There are a great many others. Shortly after the adoption of this act, as early as 1810, it was held in the case of United States v. Price, Fed. Cas. No. 16,088:

"It is discretionary with the court to give in its pleasure any direction as to the summoning of the jury from any part of the district. If the defendant desires that such directions should be given, he should make application to the court therefor."

This is a privilege which the defendant it is plain may seek as well as the government.

In the Case of Ayers (D. C.) 46 Fed. 651, it was held by so great a judge as Judge Shiras that the direction by the court that the panel of the grand jury shall be summoned from a certain part of the district is allowed by the Revised Statutes of the United States, § 802, and is not in conflict with the constitutional amendment which provides:

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein, the crime shall have been committed, which district shall have been previously ascertained by law."

That experienced judge declared, with reference to this provision of the statute law adopted by the First Congress:

"This provision of the statute, authorizing the courts to direct what part of the district a given jury, grand or petit, shall be summoned from, has remained a part of the statute law since its adoption in 1789, and now forms section 802 of the Revised Statutes, and I have no doubt that it has been acted upon in all, or nearly all, the districts of the Union. Its constitutionality cannot be successfully impeached at this late day, and that its provisions fully sustain the action of the court in directing that the grand jury summoned for the term at Sioux Falls, and which found the present indictment, should be drawn from the parts of the district named in the venire."

Now can it be denied that the court may direct the clerk or the marshal how many jurors it wants? No one has denied that power. If he can summon them from any part of the district, in his discretion, and if he can tell the officers how many he wants, why can he not tell them that he wants 8 from the county of McIntosh, or 79 or 150 from the county of Chatham? The truth is, I do not doubt that the county of Chatham has more jurors by many in the two boxes, which are interchangeable, than has any other county in this Southern district of Georgia.

Also, in this plea of abatement, it is complained that there was but one juror from Savannah. Appling had none; Bryan, none; Camden,

none; Effingham, the home of the Salzburgers, none; McIntosh, none; Tattnall, none; and Wayne, none. Where is the discrimination? And then, also, there were five counties which got only as many as Chatham. Why, there is nothing wrong about that. No one can discover even a toe hold to stand on for criticism of the court in drawing that jury.

[2] But the law is cumulative upon this subject. I quote from the decision of a great jurist, sitting at circuit. He is dead now, but all, when his name is mentioned, will recognize his eminent, original, and clear-sighted judicial power. It was the late Associate Justice Brewer of the Supreme Court of the United States, sitting at circuit, then, I believe, Circuit Judge. It is the case of United States v. Eagan, 30 Fed. 608, and decided in 1887, nine years after the statute was enacted which the learned counsel for the defendant declares repeals this statute by virtue of which these jurors were drawn:

"I might stop here," said Judge Brewer, "and yet I desire to add a word in reference to this act of 1879. I do not think that it carries the meaning or bears the construction which counsel have put upon it. Nor do I think that sections 802, 804, and 808 (U. S. Comp. St. 1901, pp. 625, 626) are repealed by implication by it. Repeals by implication are never favored."

In addition to that, Judge Thayer, who was the Circuit Judge sitting in that case with Judge Brewer, added the following comment:

"I am of the opinion that the act of June 30, 1879, with reference to drawing jurors, grand and petit, for the courts of the United States, has not repealed section 802, 804, or 808, Revised Statutes, as has been urged on the hearing of this demurrer."

Judge Pardee has passed upon this identical question in United States v. Chaires (C. C.) 40 Fed. 820, and surely the acute and penetrating mind of that great and experienced judge would not have missed the point in this case when he held that all of the grand jurors might be drawn from the county of Leon. That was ten years after the act of 1879 was passed. The jurors were taken out by the clerk and the marshal, as is the practice in Florida, from the jury box, just as the judge takes them out here, and the court held that section 802 of the Revised Statutes, which is the act of 1879, had not been repealed.

So the weight of authority and the reason of the law I think make it necessary for me to sustain the demurrer, and overrule the plea in abatement, which has been argued with such ability on both sides.

[3] As to the juror who was a member of the board of education of his county, I will say that it is not alleged in the plea in abatement that he was a member of that board at the time he was summoned, and this the statute requires. Nor do I regard the objection of any consequence. The commissioner of education could not be a member of the grand jury of the state court, because that body may review his official action. "Cessante ratione legis, cessat ipsa lex."

[4] The averment that the action of the court was to the manifest injury of the defendant is altogether insufficient. How is the injury manifest? Can we discover it from the plea? The pleading must be taken most strongly against the pleader. There is nothing said against any of these jurors. They are presumed to be good men and true. They are presumed to be impartial. There is not a single injurious fact alleged, and under the cheerful generality expressed by the words "manifest injury" the court can discover no injury whatever.