## MOFFATT v. UNITED STATES.*

(Circuit Court of Appeals, Eighth Circuit. March 6, 1916.)

### No. 4178.

1. CRIMINAL LAW ⬤⟿279, 280(2)—PLEAS IN ABATEMENT—TIME OF FILING—SUFFICIENCY.

A plea in abatement, filed nine months after the return of an indictment, on the ground that the order of the court required 30 names to be drawn from the jury box, and that 24 of the persons summoned attended, from whom the grand jury was selected, was properly overruled, where it contained no allegation excusing the delay in filing the same, nor of any facts showing that any of the grand jurors were disqualified, or that defendant was in any way prejudiced by the manner in which they were selected.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 643, 644, 647, 648; Dec. Dig. ⬤⟿279, 280(2).]

2. POST OFFICE ⬅48(4)—USING OF MAILS TO PROMOTE FRAUD—SUFFICIENCY OF INDICTMENT.

An indictment under Criminal Code (Act March 4, 1909, c. 321) § 215, 35 Stat. 1130 (Comp. St. 1913, § 10385), for using the mails to promote a scheme to defraud, is sufficient, where it sets out all the particulars constituting the offense of devising a scheme to defraud, and the use of the mails to promote such scheme, and the intent to defraud is manifest from the nature of the scheme itself.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 72; Dec. Dig. ⬅48(4).]

3. POST OFFICE ⬅49—USING MAILS TO PROMOTE FRAUD—EVIDENCE.

Evidence in a prosecution for using the mails to defraud that a letter was caused to be mailed by defendant, and that it was placed in a rented box at the post office to which it was addressed, from which it was obtained by the addressee, *held* sufficient to establish the allegation that defendant caused it to be delivered by mail.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⬅49.]

4. CRIMINAL LAW ⬅371(1)—EVIDENCE—SUBSEQUENT ACTS OF DEFENDANT.

In cases involving fraud, or the intent with which an accused does an act, collateral facts and circumstances, and his other acts of a kindred character, both prior and subsequent, not too remote in time, are admissible in evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830, 831; Dec. Dig. ⬅371(1).]

5. CRIMINAL LAW ⬅670—EVIDENCE—GENERAL SCOPE OF INQUIRY.

Evidence should be admitted, if competent and relevant, upon any issue or any phase of the case, and the party offering it need not explain the point or matter to which it is addressed, unless required to do so by the court.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 757, 1593–1596; Dec. Dig. ⬅670.]

6. CRIMINAL LAW ⬅824(8)—TRIAL—LIMITING EFFECT OF EVIDENCE.

It is not the duty of the court in a criminal case to explain and limit the bearing of evidence to the jury, in the absence of an appropriate request by the party desiring it done.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1999; Dec. Dig. ⬅824(8).]

7. POST OFFICE ⬅49—PROSECUTION FOR USING MAILS TO DEFRAUD—EVIDENCE.

Where an alleged scheme to defraud, to be carried out by the use of the mails, consisted of mailing circulars intended to induce the addressees to buy stock in an oil company, and which contained many representations as to the proved character of the property of the company, that the wells would continue to produce for many years, etc., evidence to show the condition of the wells and property within a reasonable time afterwards was admissible.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⬅49.]

8. POST OFFICE ⬅35—USING MAILS TO DEFRAUD—ELEMENTS OF OFFENSE.

Criminal Code, § 215, making it an offense to use the mails to promote a scheme to defraud, is not confined to cases where false representations are made as to existing facts, but includes as well schemes to defraud by means of representations and promises as to the future.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ⬅35.]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Criminal prosecution by the United States against Benjamin F. Moffatt. Judgment of conviction, and defendant brings error. Affirmed.

W. Knox Haynes, of Chicago, Ill., for plaintiff in error.

Charles A. Houts, Sp. Asst. U. S. Atty., of St. Louis, Mo. (Arthur L. Oliver, U. S. Atty., of St. Louis, Mo., on the brief), for the United States.

Before HOOK, Circuit Judge, and YOUMANS and ELLIOTT, District Judges.

ELLIOTT, District Judge. The plaintiff in error, Benjamin F. Moffatt, hereinafter referred to as the defendant, was indicted, charged with violations of section 215 of the Penal Code. The indictment contained six counts, and upon trial the jury returned a verdict of not guilty as to all of the counts in the indictment, except count No. 3, and as to that a verdict of guilty was returned. So much of the indictment as is material here is as follows:

"The grand jurors of the United States, impaneled and sworn in the District Court of the United States for the Eastern Division of the Eastern Judicial District of Missouri at the September term thereof, in the year 1912, and inquiring for that division and district, upon their oaths present and charge that Benjamin F. Moffatt, late of the city of Chicago, county of Cook, state of Illinois, on the 2d day of December, 1910, did wrongfully and unlawfully devise a certain scheme and artifice for obtaining money and property from a class of persons herein in this count mentioned, residing within the United States, by means of false and fraudulent pretenses, representations, and promises, and thereupon converting such money and property to his own use, without repaying, or returning, or accounting for the same to such persons, and thereby defrauding said persons of the same, an essential and necessary part of which said scheme and artifice was the intentional use by him, the said Benjamin F. Moffatt, of the mails and post office establishment of the United States, that is to say, the scheme and artifice now here described, having on said 2d day of December, 1910, entered into a contract with the Buick Oil Company, a corporation organized and then existing under the laws of the state of California, with a capital stock of five million dollars ($5,000,000.00), divided into five million (5,000,000) shares, each of a par value of one dollar ($1.00), under the terms of which said contract said Benjamin F. Moffatt, together with one Frederick Lorenz and one Ben Levon, undertook to purchase, and said Buick Oil Company undertook to sell, five hundred thousand (500,000) shares of the capital stock of said Buick Oil Company (less such number of shares of said stock as had theretofore been issued under contracts which said Moffatt and others associated with him had theretofore had with said Buick Oil Company), at a price of fifteen cents (15 cents) for each said share, said Benjamin F. Moffatt conceived on the day in this count aforesaid a device and plan for obtaining from E. S. Briggs, Charles W. Barth, Solomon S. Goldberg, John R. Gregg, L. W. Ham, Frank Houts, Wm. B. Martin, Edward C. Speckart, Wm. Trapp, Mrs. Fannie Tyrill, Mrs. Mildred Wagner, and Andrew Walz, and from others to the grand jurors unknown, and from the public generally, by the sale to such persons of said shares of said capital stock of said corporation, and of such shares of stock in said corporation as said Benjamin F. Moffatt should thereafter be able to acquire, numerous large sums of money upon divers false and fraudulent pretenses, representations, and promises by the said Benjamin F. Moffatt, made and to be made in print from time to time in newspapers, letters, circular letters, and pamphlets, sent and to be sent by mail to such persons,

in which said newspapers, letters, circular letters, and pamphlets the said Benjamin F. Moffatt would and did represent (and said representations were reasonably calculated to cause said persons to believe) that the purchase of said stock by said persons was an advisable thing to do and would be a safe and profitable investment of their funds; that the stock which said Benjamin F. Moffatt would and did offer for sale was treasury stock of said Buick Oil Company, belonging to said Buick Oil Company, and that the proceeds of such sale thereof as said Benjamin F. Moffatt had and might thereafter make would and did go into the treasury of said Buick Oil Company; that in selling said stock said Benjamin F. Moffatt was acting for and on behalf of said Buick Oil Company; that said Benjamin F. Moffatt was the general manager of the Buick Oil Company, and that the offices maintained by him in the city of Chicago, state of Illinois, were the offices of said Buick Oil Company; that the proceeds of the sale of such of said stocks as should be and had been sold by said Benjamin F. Moffatt, less the bare cost of selling said stock, had been and was being used in the development of the properties of the Buick Oil Company; that quarterly dividends had been and would be paid upon said stock of said Buick Oil Company, and that constantly increasing dividends upon said stock would be paid; that divers advertisements, circulars, and letters which said Benjamin F. Moffatt would send and had sent to said persons advertising said stock for sale was authorized and signed by said Buick Oil Company, and by D. D. Buick, president of said Buick Oil Company, and by D. D. Buick, individually, and that the said Benjamin F. Moffatt was the only person through whom said stock could safely be purchased; whereas in truth and in fact, as he, the said Benjamin F. Moffatt, well knew at the time and place of so devising said scheme and artifice for obtaining money and property in this count of this indictment mentioned, in the manner and by the means in this count aforesaid, and of converting such money to his own use, and of defrauding the persons in this count referred to out of the same, and of committing the several offenses of unlawfully using the mails in the counts of this indictment (from 1 to 6, both inclusive), and as the grand jurors aforesaid, upon their oaths aforesaid, charge the facts to be, such purchases of said capital stock by said persons was an inadvisable thing to do, and would be an unsafe, unprofitable, and losing investment of their funds; that the stock which said Benjamin F. Moffatt would thereupon sell to such persons was not treasury stock of said Buick Oil Company; and did not belong to said Buick Oil Company, and the proceeds of the sale thereof would not and did not go into the treasury of said Buick Oil Company; that in the sale of said stock said Benjamin F. Moffatt was not and would not act for and on behalf of said Buick Oil Company, but would act for and on his own account; that said Benjamin F. Moffatt was not and would not be the general manager of said Buick Oil Company, and that he had no official connection with said Buick Oil Company, and that the offices maintained by said Benjamin F. Moffatt in Chicago would not be and were not offices of said Buick Oil Company; that the proceeds of the sale of the stock which said Benjamin F. Moffatt would and did sell, less the bare cost of selling said stock, did not and would not go into the development of the properties of said Buick Oil Company, but, on the contrary, said proceeds would be converted to the use of said Benjamin F. Moffatt; that quarterly and constantly increasing dividends had not been and would not be paid upon the outstanding stock of said Buick Oil Company; that the said advertisements, circulars, and letters which the said Benjamin F. Moffatt would and did send out in advertising said stock for sale, purporting to be authorized and signed by said Buick Oil Company, and by D. D. Buick, president of said Oil Company, and by D. D. Buick, individually, would not be and had not been authorized or signed by the Buick Oil Company, by D. D. Buick, president of the Buick Oil Company, or by D. D. Buick, individually, but that, on the contrary, said advertisements, circulars and letters, purporting to be so signed and authorized, would be and were sent out by said Benjamin F. Moffatt without the knowledge or consent and over the protest of said Buick Oil Company, D. D. Buick, president of said Buick Oil Company, and D. D. Buick, individually, and that said Benjamin F. Moffatt was not and would not be the only person from whom said stock could safely be purchased."

Omitting the overt acts set forth in the first count of the indictment, the third count, upon which the defendant was convicted, is as follows:

"Third Count. And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that said Benjamin F. Moffatt, on or about the 16th day of December, 1910, so having devised the scheme and artifice for obtaining money and property from the class of persons referred to and described in the first count of this indictment by means of false and fraudulent pretenses, representations, and promises in said first count mentioned and described, and of defrauding said persons of their money and property by the means and in the manner in said first count aforesaid (the allegations of said first count descriptive of said scheme and artifice including the allegations of intent and knowledge on the part of said Benjamin F. Moffatt are by reference hereby incorporated in this count as fully as if here set forth and repeated), in and for executing said scheme and artifice and attempting so to do, and for the purpose and with the intention on his part of executing said scheme and artifice, and attempting so to do unlawfully, feloniously, and knowingly did cause to be delivered by mail by the post office establishment of the United States, according to the direction thereon, at the city of St. Louis, and within the division and district aforesaid, and within the jurisdiction of the court, a certain letter, dated at Chicago, Ill., and inclosed in an envelope and addressed and directed to 'Mr. E. S. Briggs, 418 Wainwright Bldg., St. Louis, Mo.,' and which said envelope then and there bore a return card as follows, to wit: 'Return in Five Days to Buick Oil Company, Room 420 Marquette Bldg., Chicago, Ill.,' and which said envelope and letter therein contained was by the said Benjamin F. Moffatt, at the time aforesaid, deposited and caused to be deposited in the mails of the United States, with an uncanceled 2-cent postage stamp thereon, at the city of Chicago, in the state of Illinois, for mailing and delivery, with the intent on the part of him, the said Benjamin F. Moffatt, that said letter and said envelope should be carried by the mails of the United States and delivered to said E. S. Briggs, one of the said persons so to be defrauded, and the person to whom it was directed, according to the directions thereon, at and in the city of St. Louis, state of Missouri, and which said letter aforesaid was thereupon delivered by mail by the post office establishment of the United States, according to the direction thereon, which said letter was as follows, to wit:

" 'Officers.                                                         Home Office.
" 'D. D. Buick, Pres.                                      Los Angeles, Cal.
" 'J. B. Lehigh, Vice Pres.                                      Properties.
" 'Stacy C. Lamb, Treas.                                       Maricipa, Cal.
" 'J. M. Herndon, Sec.                                           Sunset, Cal.
" 'Thos. D. Buick, Asst. Sec.                                   Midway, Cal.

" 'Buick Oil Company, of California.

" 'Capital $5,000,000.

" 'D. D. Buick, President.

" 'Room 420–421 Marquette Building, Chicago, Ill.

" 'Last Opportunity to buy Shares at 50 Cents.

" 'We take this opportunity to notify you as a stockholder of this company that this is the very last opportunity you will have to purchase shares of this company at 50c. This company's shares go to 75c December 20th, and we positively will not accept any applications, unless reservations have already been made, for the sale of any shares at 50c after the date of advance.

" 'To the stockholders who wish to pay for their stock in full cash we desire to say that they may deduct 5% from the total amount of their remittance. This does not apply to stockholders who buy on the installment plan.

" 'The most important event heretofore recorded in the progress of this company transpired this week when our workmen began installing the casing for our well. The drilling has been stopped for a few days to allow this casing or pipe to be set in place. Drilling will begin immediately after this is done, which should be next Sunday or Monday.

" 'As per our notice heretofore sent to you, Mr. Buick is now in California and is in charge of general directions of the company in the field. He has with him a party of stockholders, and he contemplates being able to show these stockholders, what it means to strike oil in this field, as he anticipates the coming in of our No. 1 well before these stockholders leave California.

" 'If you desire to purchase any of these shares or to add to the holdings you already have in this company, we would advise you by all means to fill out the inclosed application, send your remittance with it and mail same not later than Saturday or Sunday of this week. In case you cannot send your remittance for a few days, you should write us to this effect, and definitely state when your first remittance will be received, we will be glad to hold the amount of shares you desire for a period of three days. This only applies to stockholders, and does not apply to stock which you may reserve for your relatives or friends, so that in making out the application, see that your name appears as the applicant even if you buy for some one else.

" 'We are, with very best wishes,

" 'Yours very truly,                Buick Oil Company,

                        " 'Per B. F. Moffatt, Gen. Mgr.'

"Contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States."

[1] This indictment was returned and filed in said court on the 12th day of December, A. D. 1912. Thereafter, on September 27, 1913, nine months after the filing of the indictment, the defendant Moffatt filed a plea in abatement. The substance of the plea is that the grand jury by which the said indictment was returned was not a valid and lawful grand jury of the United States, in that the selection and drawing of said jurors, constituting the panel, was not conducted in the manner and form provided by statute. It is further set forth in the plea that an order was made for the selection and drawing of the grand jurors, requiring that there be drawn from the jury box of said court a number of names in excess of the maximum number authorized and required by law for a grand jury, to wit, 30 names, and that pursuant to said order the names of 30 persons were drawn from said jury box; that among the said 30 names so drawn were the names of 17 persons constituting the grand jury which returned the said indictment. It is further set forth in said plea that a venire was issued commanding the marshal to summon said 30 persons whose names had been so drawn, and that he did summon said 30 persons to be and appear in said court, and in obedience to said summons there did appear on the 1st day of October, 1912, 24 of said persons so drawn and summoned, and that from and among said 24 persons so summoned, and so appearing in court as aforesaid, a grand jury of 17 persons were selected and impaneled by the court, and that said jury was not constituted by drawing not exceeding 23 names. It is further set forth that:

"Said supposed grand jury, so selected by the court as aforesaid, assumed to act as a legal grand jury for said division of said district, and without lawful and valid power to do so act as a grand jury, to the great prejudice of this defendant, and in violation of the lawful and constitutional rights of this defendant, and on, to wit, the 12th day of December, 1912, return into this court and cause to be filed herein the said supposed indictment in this cause, whereby this defendant says he is prejudiced, and has been deprived of his liberty without due process of law, and has been held to answer for an infamous offense without valid and lawful presentation of indictment by a lawful grand jury. And this defendant says that all of the aforesaid orders and proceedings relating to the formation and selection of the aforesaid supposed grand jury and the act thereof in returning and causing to be filed said sup-

posed indictment appear of record in this court, and to the record thereof the defendant respectfully calls the attention of the court."

The transcript of record filed in this cause does not show that the United States attorney demurred to the plea, nor that a motion to strike was made. None of the records of the court with reference to the manner of drawing the jury, which records are referred to in the plea, are set forth in the transcript of record—simply the following order, October 1, 1913, overruling the plea in abatement:

"Now, at this day, come the parties hereto by their respective attorneys, and the plea in abatement filed by the said defendant is argued and submitted, and adjudged insufficient, and overruled by the court."

In view of the fact that there is no admission of the facts set forth in the plea, by demurrer or otherwise, we must assume that the court considered the allegations of the plea in abatement in the light of the record as to drawing the grand jury, to which reference was made in the said plea, and that the order adjudging the plea in abatement insufficient and overruling the same was made upon a consideration of the allegations of the plea and the record of the court as to the method of drawing and impaneling the grand jury. In the absence of a specific admission by demurrer or otherwise, and an entire absence of the record of the court as to the manner in which the grand jury was drawn and impaneled, the record here does not present this question for review.

It may be noted, also, that this plea contains no averment of specific facts showing that the defendant has been prejudiced or injured by the selection of the grand jurors in the manner alleged. It is not even alleged that any juror was disqualified, nor is it alleged that the grand jury was composed of jurors not selected pursuant to the order of the court, in the manner provided by law—simply that 24 responded to the summons, instead of the limited number of 23. No showing is made as to whether or not 1 of the 24 was disqualified or whether or not all except 17 were disqualified, and while it may follow that, if only 23 names had been drawn and 23 persons subpœnaed, instead of 30, the grand jury might have been differently composed, from this it cannot be inferred that injury or prejudice resulted to the defendant. Hyde v. United States, 225 U. S. 373, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614.

There is no allegation in the plea that defendant had not been held under arrest prior to the finding of the indictment, or that he did not know it was being investigated by the grand jury. No excuse whatever is attempted to be given in the plea for not interposing it sooner than more than nine months after the return and filing of the indictment. There is no allegation in the plea that the defendant was not present when the grand jury was selected, nor alleging that he was absent or that he was without the state, or, if without the state, when he came to the place where the court was held. There is no intimation in the plea of the time when the accused first ascertained the facts stated therein, nor any reason indicated for this long delay in filing the plea.

This is important, in view of the rules applicable to such pleas,

one of which strictly exacts the most explicit averments, and the other of which requires the plea to be presented with the greatest promptness —general rules which are applied, not merely to objections to the formation of a grand jury, but to all those matters of abatement, which in the technical sense are dilatory, and which, even if sustained, do not finally dispose of the subject-matter of the indictment. This plea does not allege want of knowledge of threatened prosecution, nor want of opportunity to present his objections earlier, nor assign any ground why exception was not taken or objections made before.

An objection of this kind should be made at the earliest day that the defendant has an opportunity to make it. Nineteen days after the indictment was filed was held too great a delay in Lowdon v. United States, 149 Fed. 674, 79 C. C. A. 361. A delay of 5 days was noted in treating a plea as insufficient in Agnew v. United States, 165 U. S. 36, 17 Sup. Ct. 235, 41 L. Ed. 624. Such a plea, filed 19 days after service of process on the indictment, and more than 2½ months after it was returned, and which contains no statement as to when the fact of the indictment or the matters alleged first became known to the defendant, comes too late. United States v. American Tobacco Co. (D. C.) 177 Fed. 774, 777.

Under the foregoing circumstances, even if the record was here, and it would sustain all of the allegations of the plea in abatement, the plea must be denied under the general rule of the federal courts, that omissions which do not impair any substantial right or prejudice the defendants, or accused, will be disregarded, unless otherwise required by positive statute. Section 1025, Revised Statutes (Comp. St. 1913, § 1691), declares that no indictment, found and presented by a grand jury in any Distirct or Circuit or other court of the United States shall be deemed insufficient, nor shall the trial, judgment or other proceedings thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant. United States v. Benson et al. (C. C.) 31 Fed. 897–901. This statute, in effect, directs that the existence of irregularity, if error of form, shall not be presumed a wrong to the accused; but it must be shown to be so. Of the irregularities alleged by these pleas and which are subject to this rule, may be mentioned those as to impaneling the jury, the disqualification of jurors, etc.

If there were doubts whether this section includes irregularity in the entire procedure or only those of form in the indictment, the ruling of Mr. Justice Brewer, concurred in by Judge Thayer, in United States v. Molloy (C. C.) 31 Fed. 23, disposes of them in favor of the first proposition. United States v. Cobban (C. C.) 127 Fed. 713. A plea in abatement to an indictment, alleging that an order of the judge directing the selection of a certain number of names from each of several counties from which jurors were to be drawn constituted a manifest injury to the accused, without showing how accused was injured thereby, was insufficient. United States v. Merchants' & Miners' Transportation Co. et al. (C. C.) 187 Fed. 355.

And such a plea, on the ground of irregularity in the constitution of the grand jury, to be good, must allege facts showing defendant

was prejudiced thereby. That some members of the grand jury were, by order of the court, summoned by the marshal from the body of the district, without the drawing of names, is not such an irregularity as will affect the validity of an indictment, where such members were duly qualified. United States v. Nevin (D. C.) 199 Fed. 831–833. First, the record upon which the court determined such issue as was presented by the plea in abatement, is not here for review. Second, the plea in abatement is insufficient, considering such facts as are alleged, and as appear of record.

A demurrer was interposed and overruled. Defendant assigns error. The contention of the defendant is that the indictment was insufficient to confer jurisdiction upon the court to try the defendant, in that it does not appear from the description of the alleged scheme and artifice that an intent to defraud was an element thereof.

The uniform rule on this subject is that all of the material facts and circumstances embraced in the definition of the offense must be stated, or the indictment will be defective. No essential element of the crime can be omitted without destroying the whole pleading. The omission cannot be supplied by intendment or implication, and the charge must be made directly, and not inferentially, or by way of recital. The statute alleged to have been violated is directed against devising or intending to devise any scheme or artifice to defraud, to be effected by communication through the post office. A reference to the indictment as above set forth, discloses, as a foundation for this charge, a scheme to defraud, which the accused devised, with all such particulars as are essential to constitute the scheme and to acquaint the defendant with what he must meet at the trial. United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516.

[2] The crime here charged is made up of acts and intent, and these must be set forth in the indictment with reasonable particularity, time, place, and circumstance. The essential requirements—indeed, all the particulars—constituting the offense of devising a scheme to defraud are set out at length in this indictment, and the intent to defraud is manifest from the nature of the scheme itself. This is sufficient. Walker v. United States, 152 Fed. 111, 81 C. C. A. 329. An indictment under this statute is sufficient if the averments bring the charge within the substance and true meaning of the statute. Causing to be delivered by mail by the post office establishment of the United States the letter set forth in count No. 3 of the indictment, in executing the scheme, is the gist of the offense denounced by the statute, and is fully covered by the plain terms of the indictment. It is the causing the delivery of this letter at the place named in the indictment, that conferred jurisdiction of this prosecution upon the trial court. Lemon v. United States, 164 Fed. 957, 90 C. C. A. 617; Gould v. United States, 209 Fed. 730, 126 C. C. A. 454.

It is contended that the intent to perpetrate the fraud must be alleged in the part of the indictment which follows the videlicet, and that it is not sufficient to allege it in the descriptive part of the indictment. This contention is without merit. It is sufficient if it is charged in any part of the indictment. United States v. Maxey (D. C.)

200 Fed. 997–1001; Lemon v. United States, 164 Fed. 953, 90 C. C. A. 617. In an indictment for mailing a letter in execution or attempted execution of a scheme to defraud, in violation of this statute, if the scheme is sufficiently outlined to show its design and adaptability to deceive and to fairly acquaint the accused with what he is required to meet, it answers the requirements of the statute. Brooks v. United States, 146 Fed. 223, 76 C. C. A. 581. The test to be applied is, not whether the material averments of this indictment might have been made more accurate and certain, but whether they plainly embrace in their terms both requirements, of notice of the ultimate facts to be proved against the accused, and specification thereof which will leave no second prosecution open for the alleged offense. If these requisites are sufficiently stated it is the duty of the court to uphold the indictment. Cochran v. United States, 157 U. S. 286, 15 Sup. Ct. 628, 39 L. Ed. 704; Rosen v. United States, 161 U. S. 29, 16 Sup. Ct. 434, 480, 40 L. Ed. 606; Markham v. United States, 160 U. S. 319, 16 Sup. Ct. 288, 40 L. Ed. 441.

Section 215 of the Penal Code only requires two things to complete the offense charged in this indictment, (1) That a scheme to defraud be devised; and (2) that, for the purpose of executing it, the defendant caused to be delivered by mail, by the post office establishment of the United States, the letter set forth in count 3 of the indictment, to the person therein named. Keeping the contention of the defendant in mind, an examination of the indictment above set forth discloses that it alleges that the defendant did wrongfully, etc., devise a certain scheme and artifice for obtaining money and property * * * by means of false and fraudulent pretenses, representations, and promises, and thereupon converting such money and property to his own use. Then follows an allegation that he had contracted to purchase 500,000 shares of stock in the Buick Oil Company, and after that the indictment proceeds to allege that he conceived and devised a plan for obtaining money and property from the persons named in the indictment by the sale to said persons of said shares of stock by divers false and fraudulent pretenses, representations, and promises, which were set out in the indictment, in specific terms setting forth the scheme and artifice above referred to.

The indictment then alleges, in substance, that the defendant at the time and place of devising the scheme and mailing the letter referred to in count 3, and of converting such money to his own use and of defrauding the persons in that count referred to, out of the same, well knew that said representations were false, and that it was his intent to convert the proceeds of all sales to his own use, contrary to the representations made by him. His intent to defraud clearly appears from the ordinary, plain interpretation of the language used in the indictment. It is clear from an examination of the indictment that it is charged in the indictment that this scheme and artifice consisted of false and fraudulent pretenses, representations, and promises, plainly setting them forth, and was devised by the defendant. It is alleged, not only that these representations and pretenses and promises were false, but that he knew them to be false, and that it was his intention

to defraud the persons named in the indictment, and that he would convert the money received by virtue of such false pretenses to his own use. Taking the entire averments of the indictment, we think they clearly charge both of the acts which section 215 of the Penal Code of the United States require to complete the offense charged, and the demurrer to the indictment was properly overruled.

[3] The next assignment of error insisted upon by the defendant is that the defendant's motion for an instructed verdict was erroneously denied—that the cause should not have been submitted to the jury. In this connection, it is contended by the defendant that the evidence to support the verdict is insufficient in that there is no evidence tending to show that the letter upon which the conviction is based was *"delivered by mail according to the directions thereon."* The evidence in the case clearly shows that this letter, set forth in count 3 of the indictment, was by the defendant delivered or caused to be delivered at the post office establishment of the United States at Chicago, properly stamped, addressed "Mr. E. S. Briggs, 418 Wainwright Bldg., St. Louis, Mo." The letter and envelope were produced; the envelope was postmarked, "Chicago, Illinois, December 15, 1910." The addressee of this letter, Briggs, was placed on the witness stand and testified:

"Q. Now, Mr. Briggs, I hand you a letter marked Exhibit 51 and an envelope marked Exhibit 51a and I will ask you if you received that letter in that envelope through the United States mail at about the time of the postmark on the envelope? A. Yes, sir. Q. Now, did you receive this letter and envelope through the United States mail here at St. Louis? A. Yes, sir.

"Cross-Examination. Q. Mr. Briggs, who delivered this letter to you? A. Why, it come in the usual course of the mails, with my personal as well as business mail. It all come in at one time. Q. That is to say, the carrier brought it in? A. Yes, sir. Well, that is, we have in our office—we have what is called the mail room, and all the mail for all of the different railroad offices for the different officers first comes to that room, and he assorts it, and then—I really think that on the plan the railroads have adopted we have to go after the mail at the post office. They have a box here—a large box. Q. Well, you didn't receive this from the hands of anybody connected with the United States post office? A. No, sir; I did not."

The introduction of the letter was then objected to, on the ground the evidence did not show the letter had been delivered by the post office establishment in the city of St. Louis. In our opinion, under this undisputed testimony, this defendant caused the delivery of this letter at St. Louis, by the post office establishment of the United States, and that a delivery to the messenger at the post office was a delivery to Briggs. United States v. Safford (D. C.) 66 Fed. 942; United States v. Lee (C. C.) 90 Fed. 256; United States v. Bullington (C. C.) 170 Fed. 121.

The plain purpose of Congress in making it an offense to knowingly cause to be delivered by mail, according to the direction thereon, a letter, etc., was to confer jurisdiction upon the court at the place where the letter is delivered, to punish the offender, and the statute must not be so strictly construed as to defeat this plain intention of Congress. The defendant was admittedly the moving cause. The evidence shows that it was he that caused the preparation

of the inclosures, the paying of the postage, and the mailing of the letter at Chicago, with the intent and purpose that it should be delivered at St. Louis, and the fact that it was received at the post office in the city of St. Louis, instead of being delivered by the department itself at the special address, in no manner qualifies the intent and purpose with which the defendant deposited it. The delivery was in the city of St. Louis, in substantial compliance with such intent and purpose, and conferred the jurisdiction in this case intended by Congress when it defined the offense. We are of the opinion that this evidence was sufficient to justify the jury in finding that the defendant caused this letter to be delivered by mail according to the directions thereon, at St. Louis, Mo.

[4] A witness was allowed to testify over objection as to what was done in regard to oil wells on the property after the last date at which the mails were charged to have been fraudulently used, and whether the wells produced oil, and how long they continued productive. The objection of counsel for the accused was as follows:

"I object. The history of what was done there must end on the 10th of October (1911). That is the last day that Moffatt is charged with having knowledge of the conditions, and we cannot impute any fraudulent intent to Moffatt for something that occurred afterwards."

After the testimony was received counsel said:

"To make my record perfectly clear, I move at this point to strike out all that this witness has said in reference to conditions or operations after the 10th of October, 1911."

It will be observed that the objection was broad enough to challenge the admissibility of all evidence of acts and conditions after the date mentioned, including the acts of the accused himself. In other words, the objection on its face was not confined to the productiveness of the several oil wells, over which it might be said the accused had no control. It is quite true that an act which is not an offense when committed cannot be made one by the subsequent independent act of the person with which it has no connection (United States v. Fox, 95 U. S. 670, 24 L. Ed. 538); also that the criminal character of a transaction is to be determined by the conditions existing at the time (Norton v. United States, 205 Fed. 593, 123 C. C. A. 609); also that the intent with which an accused does a subsequent act cannot be imputed to him as of the prior date of the crime charged (United States v. Wootten [D. C.] 29 Fed. 702). These rules, however, do not conflict with or impair the long-established doctrine that in cases involving fraud, or the intent with which an accused does an act, collateral facts and circumstances, and his other acts of a kindred character, both prior and subsequent, not too remote in time, are admissible in evidence. See Allis v. United States, 155 U. S. 117, 119, 15 Sup. Ct. 36, 39 L. Ed. 91. Therefore, so far as the effort of counsel was to exclude the subsequent acts of the accused of the character mentioned, it was properly denied.

[5, 6] Evidence should be admitted, if competent and relevant upon any issue or any phase of a case. See Moore v. United States,

150 U. S. 57, 61, 14 Sup. Ct. 26, 37 L. Ed. 996. The party offering the evidence need not explain the point or matter to which it is addressed, unless required to do so by the court. Farnsworth v. Nevada Co., 102 Fed. 578, 42 C. C. A. 509. Nor in the absence of an appropriate request by the opposing party is it the duty of the court to explain and limit the bearing of evidence to the jury. The duty to make the request rests upon the party who desires it done. In Elliott v. Peirsol, 1 Pet. 328, 338, 7 L. Ed. 164, the court said:

"Courts of justice are not obliged to modify the propositions submitted by counsel, so as to make them fit the case. If they do not fit, that is enough to authorize their rejection. * * * If any part of it (the evidence) was incompetent, the court might, on a general motion to exclude the whole, have excluded such parts; but the court was not obliged to do so."

"Relevancy does not depend upon the conclusiveness of the testimony offered, but upon its legitimate tendency to establish a controverted fact." Interstate Commerce Commission v. Baird, 194 U. S. 25–44, 24 Sup. Ct. 563, 569 (48 L. Ed. 860).

In Columbian Ins. Co. v. Lawrence, 2 Pet. 24, 44, 7 L. Ed. 335, Marshall, C. J., said:

"It is undoubtedly true that questions respecting the admissibility of evidence are entirely distinct from those which respect its sufficiency or effect. They arise in different stages of the trial, and cannot, with strict propriety, be propounded at the same time."

A recognized method of securing the limitation of evidence to its legitimate bearing is by a request for an instruction to the jury. Connecticut Mutual Life Ins. Co. v. Hillmon, 188 U. S. 208, 23 Sup. Ct. 294, 47 L. Ed. 446; Southern Pacific v. Schoer, 114 Fed. 466, 52 C. C. A. 268, 57 L. R. A. 707.

[7] But, aside from the foregoing, the evidence of the subsequent result was admissible in another aspect of the case. One of the features of the scheme to defraud charged in the indictment was the use of "false and fraudulent pretenses, representations, and promises" reasonably calculated to induce persons to believe that the purchase of the oil stock would be a safe and profitable investment of their funds. There was abundant evidence that the accused did not confine himself to a permissible puffing or commendation of the enterprise, as to which there is a limit (Horn v. United States, 182 Fed. 721, 105 C. C. A. 163); nor to representations of existing conditions with respect to the property. Had he done so, it might fairly be urged that he should not be affected by a subsequent failure beyond his control, such as a failure to find oil or an early exhaustion of the flow of wells which were sunk. The same might fairly be urged had his assurances of the future been honestly though mistakenly made. The letters and literature which he caused to be circulated through the mails for the purpose of inducing purchases of stock were filled with positive and extravagant statements of prospective and enduring value, and the evidence of a fraudulent intent in making them was clear and convincing. Among other things he represented that he regarded the stock as destined to be worth several hundred per cent. of the price asked, within a year; that the venture was said to be "a successful producing enterprise";

that certain conditions proved "that the Kern County wells will be producing oil for hundreds of years"; that experts say "this sort of thing [the running of oil from gushers into lakes] will continue in this field when the known oil fields of the world are exhausted"; that "it is estimated that under every acre of California oil lands lie over 500,000 barrels of oil"; that "you can see from the various lines of proof that we have given you just how this property proves itself to be the equal of any in California's famous field"; that the stock would be a permanent investment and a source of large income during the declining years of the purchasers; "Let Mother Earth from her stores of inexhaustible wealth be your banker;" that the records showed that the percentage of failures in that oil district was "exactly 2 per cent"; that the company will be made the greatest oil producer in the world; that investment in the stock "is no longer speculative," and so on and so on. The question "What was the outcome?" naturally suggests itself to the mind, and evidence of what happened within a reasonable time afterwards, that the predictions and assurances failed, was relevant to the issue that was being tried. Of course it remained to be shown that the accused did not act honestly, but with a fraudulent intent. If he desired to have the evidence in question accordingly limited in its application to the case it was his duty to make a seasonable and appropriate request for the purpose. Being relevant the court properly admitted it.

[8] There can be an honest, though mistaken, judgment of the future from existing conditions; even sincere but visionary optimism is allowable. But there can also be alluring suggestions and predictions of what will come to pass, put forth without reasonable warrant and with the fraudulent intent to profit by inducing belief and reliance among the credulous and uninformed. In fact, that is one of the most successful methods of defrauding well-meaning people, who hope to relieve the stress of limited incomes. It is not essential that such schemes be addressed only to cupidity or desire of ill-gotten gain. The closer they are conducted along the lines of legitimate enterprises the more effective to defraud they become. In Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709, there was an attempt to confine the statute to cases of false pretenses as at common law, in which there must be a misrepresentation as to an existing fact, but the court held that "it includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future. The significant fact is the intent and purpose." It was also said that it would strip the statute "of value to confine it to such cases as disclose an actual misrepresentation as to some existing fact, and exclude those in which is only the alluring of a specious and glittering promise." In commenting on the Durland Case, this court said, in Brooks v. United States, 146 Fed. 223, 76 C. C. A. 581, that:

The statute "contemplates any scheme involving matters of enforceable or unenforceable contract, representation of facts, expression of opinions, or assurances of past, present, or future conditions, provided only it was designed and reasonably adapted to deceive and defraud. * * * If the intent and purpose is to deceive and defraud the unwary, it matters not what form the project is made to take."

Complaint is also made that the district attorney made an argument to the jury on the fact that one of the wells made some money for a time, but lasted about a year. Counsel for the accused said:

"I object to that statement, that the well lasted about a year. There was some evidence to that effect, but it was stricken out by order of the court."

As to this it is enough to say that the sole ground of objection was that the testimony to which the district attorney referred had been stricken out and was no longer in the case. Counsel was in error; the testimony had not been stricken out.

The judgment below is affirmed.