### BERGERA v. UNITED STATES.

### THOMSON v. SAME.

(Circuit Court of Appeals, Eighth Circuit. February 28, 1924. Rehear Denied May 12, 1924.)

Nos. 6291, 6301.

1. **Conspiracy ⬅️47—Post office ⬅️49—Evidence held sufficient to sustain conviction for conspiracy to use mails to defraud, and for use of mails to defraud.**
   In a prosecution for conspiracy to violate Penal Code, § 215 (Comp. St. § 10385), relating to the use of the mails to promote fraud, and for using the mails to defraud, evidence *held* sufficient to sustain a conviction on both charges; alleged scheme being to confer spurious Masonic degrees.

2. **Criminal law ⬅️830—Requested instruction, wrong in part, properly refused.**
   A requested instruction including one statement, at least, that is not the law, court was justified in refusing it.

3. **Criminal law ⬅️829(1)—No error in refusing instruction covered by given instructions.**
   There was no substantial cause for complaint of refusal of requested instruction as to good faith, where the matter referred to was fully covered by given instructions.

4. **Conspiracy ⬅️32—Post office ⬅️50—Charge as to facts authorizing conviction not erroneous.**
   In a prosecution for conspiracy to use mails to promote fraud, and to defraud by conferring Masonic degrees, *held*, that there was no error in a charge permitting conviction if defendants falsely represented the authority and power of the organizations from which they derived their power, and the privileges which would be conferred by the degrees granted, even though they established their authority to confer degrees.

5. **Criminal law ⬅️1043(2)—No review of admission of evidence, in absence of specific objection.**
   The question of whether it was proper to introduce in evidence an oral opinion of a court in Scotland, and a judgment of such court cannot be considered on appeal, where objection thereto did not state any ground.

6. **Criminal law ⬅️1169(1)—Introduction of newspaper clippings held not prejudicial.**
   In a prosecution for conspiracy and use of mails to defraud, admission of newspaper clipping discussing a decision of a foreign court, to explain a conversation between one of the defendants and a witness, *held* not prejudicial as to such defendant.

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Criminal law ⟨⟩⟩338(3)—Newspaper clippings held admissible in evidence to explain a conversation.**

In a prosecution for conspiracy to use United States mails to promote fraud, and for use of the mails to defraud, in conferring spurious Masonic degrees, newspaper clippings relating to an opinion of a foreign court *held* admissible against one defendant, as throwing light on conversation between him and a witness for the government.

**8. Criminal law ⟨⟩⟩673(4)—Evidence admissible against one defendant held properly admitted.**

A defendant, who made only a general objection to evidence, cannot complain of its unqualified admission, where it was admissible as against another defendant; there being requested no instruction that the evidence should be considered only as to the other defendant.

**9. Criminal law ⟨⟩⟩447—Evidence of writer of letter as to undisclosed meaning held improperly admitted.**

Court erred in permitting witness, writing letters to defendant to testify as to sense in which he used a certain expression, where his undisclosed idea was in no way communicated to defendant, and the language was plain and unambiguous.

**10. Conspiracy ⟨⟩⟩45—Post office ⟨⟩⟩49—Evidence as to customs and practices of Masonic lodge held admissible.**

In a prosecution for conspiracy to use the mails to promote fraud, and for use of the mails to defraud, by conferring spurious Masonic degrees, *held*, that the evidence showed such claims as to defendants' connection with the Grand Lodge of Scotland as rendered evidence as to its customs and practices admissible, and that evidence that a defendant not on trial was expelled by the Grand Lodge of Scotland, and was therefore without authority to sign high degree diplomas which defendants were disposing of, was admissible.

**11. Criminal law ⟨⟩⟩400(1)—Witness held properly permitted to testify as to historic fact.**

Whether a certain Masonic lodge ever granted the chartering power to any of her daughter lodges *held* a historic fact, concerning which a member of it was qualified to speak; he having testified that he was familiar with the entire written history of that lodge, and the question not being as to the contents of some charter.

**12. Criminal law ⟨⟩⟩1169(2)—No prejudice by showing something already in case.**

There was no prejudice by the admission of evidence showing a fact that was already in the case by reason of other evidence of the fact.

**13. Criminal law ⟨⟩⟩1169(1)—Testimony as to undisclosed meaning held not prejudicial.**

Testimony of witness for the prosecution as to sense in which he used a certain expression in letter, though erroneous, *held* not to affect substantial rights of defendant.

**14. Criminal law ⟨⟩⟩1186(4)—Duty to examine record without regard to technical errors.**

Under Judicial Code, § 269, as amended (Comp. St. Ann. Supp. 1919, § 1246), it is duty of reviewing court to examine record, without regard to technical errors, defects, or exceptions, which do not affect the substantial rights of the parties.

In Error to the District Court of the United States for the District of Utah; Martin J. Wade, Judge.

Dominic Bergera and Matthew McBlain Thomson were convicted of conspiracy to commit an offense against the United States, and use of the mails to defraud, and they bring error. Affirmed.

⟨⟩⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

A. L. Hoppaugh, of Salt Lake City, Utah (Frank A. Johnson, Charles C. Dey, and Robert E. Mark, all of Salt Lake City, Utah, on the brief), for plaintiff in error Bergera.

D. N. Straup, of Salt Lake City, Utah (Joel Nibley, of Salt Lake City, Utah, on the brief), for plaintiff in error Thomson.

John Jensen, Sp. Asst. U. S. Atty., of Salt Lake City, Utah (Charles M. Morris, U. S. Atty., and David H. Cannon, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for the United States.

Before KENYON, Circuit Judge, and TRIEBER and MUNGER, District Judges.

KENYON, Circuit Judge. On the 23d day of April, 1921, the grand jury of the District Court of the United States for the District of Utah, sitting in the Central Division thereof, returned an indictment in ten counts against Matthew McBlain Thomson, Thomas Perrot, Dominic Bergera, and Robert Jamieson, herein designated as defendants. Count 1 charges a conspiracy to commit an offense against the United States, to wit, to violate section 215 of the federal Penal Code (Comp. St. § 10385), relating to the use of the United States mails to promote fraud. The other nine counts are not based upon a conspiracy, but allege the use of the mails to defraud. The alleged scheme to defraud is identical in all counts, and briefly is that defendants, without authority or right, acting through the instrumentality of the American Masonic Federation, a corporation of the state of Idaho, and the Confederated Supreme Councils of the American Masonic Federation, a corporation of the state of Utah, were conferring spurious Masonic degrees upon various and sundry individuals and receiving money therefor; that they represented to the public generally throughout the United States, for the purpose of inducing parties to join their organization, that they had authority to confer craft degrees in Masonry by virtue of a charter from the Supreme Council, A. A. S. R. of Free Masonry for the Sovereign and Independent State of Louisiana, the right being given by said Supreme Council of Louisiana, a corporation of that state, to defendant Thomson, and thereafter surrendered and transferred by him to the American Masonic Federation; that said Supreme Council of Louisiana traced its Masonic authority and power to Mother Kilwinning Lodge No. O of Scotland, which they represented to be the oldest known source from which Masonic power flowed; that the power to confer the high degrees in Masonry to consistories, councils, and conclaves was by virtue of a patent granted defendant Thomson by the Grand Council of Rites of Scotland in the year 1898; Thomson transferring said patent to the Confederated Supreme Councils of the American Masonic Federation. The indictment also alleges that fraudulent and deceptive representations were made, not only as to the chain of title, but as to the authority and power and history of these two corporations, and that defendants falsely and fraudulently represented that said American Masonic Federation, and said the Confederated Supreme Councils of the American Masonic Federation were the only regular, legitimate and true Scottish Rite Free Mason bodies in Amer-

ica, and that they traced their history through regular and true charters to legitimate Scottish Rite bodies in Scotland, which Scottish Rite bodies were of unimpeachable authority, reputation, and responsibility, reckoning their existence from time immemorial; that such representations were false, and that, in carrying out said scheme to defraud, papers, magazines, and letters were mailed by defendants.

The case was tried to a jury, and defendants Thomson, Perrot, and Bergera were found guilty on all counts. Jamieson was never within the jurisdiction of the court. May 16, 1922, the three defendants were each sentenced on each count to two years in the United States penitentiary at Leavenworth, said terms to run concurrently, and each to pay a fine of $5,000 on the first count. Thomson and Bergera bring writ of error to this court. Perrot is serving his sentence. The cases of both defendants were presented and heard together, and we deal with both in one opinion, referring for convenience to the cases by their numbers, viz. Bergera case, No. 6291; Thomson case, No. 6301.

It is without question in the evidence that the American Masonic Federation was incorporated under the laws of Idaho in 1907, and that the Confederated Supreme Councils of the American Masonic Federation was incorporated under the laws of the state of Utah, January 3, 1911. The Confederated Supreme Councils dealt only with the higher degrees of the alleged Masonry. Defendant Thomson, from the time of the organization of the American Masonic Federation, up to the time of the return of the indictment, organized lodges throughout the United States and in some foreign countries, and a membership running into the thousands was secured. Offices of both corporations were maintained at Salt Lake City. It was also without dispute that Thomson did receive from the Grand Commander of the Grand Council of Rites of Scotland, April 20, 1898, a charter or patent, as follows:

"Unto All Free and Accepted Masons of Whatever Degree—Greeting: Know ye that we, the M. E. and R. Sovereign Grand Master and High Priest of the Scottish Grand Council of Rites, do authorize and empower our trusted and well-beloved frater cousin and brother in the bond, Matthew McBlain Thomson, XLVII degree 33 degree 33 degree 90 degree 96 degree to confer upon any worthy Mason any degree recognized and wrought under our Grand Council and to establish councils, conclaves or tabernacles for working the same in any country where there is not already a Grand body working such degrees, and this shall be his warrant for so doing.

"As witness our hand and the seal of Grand Council.

"At Airdrie, Scotland, this twentieth day of April, A. D. 1898.

"Peter Spence, M. E. & R. S., G. M. & H. P."

That he brought this patent with him to America. Later he secured from Joseph N. Cheri, Grand Commander of the Supreme Council of Louisiana, an indorsement on the patent as follows:

"We, Jos. N. Cheri, M. O. S. G. C. of the Supreme Council of the State of Louisiana, do heartily indorse the purposes on the reverse hereof.

"J. N. Cheri, M. P. S. G., C. of the S. C. of La.,

"Honorary Member of the G. C. of Rites of Scotland."

There appears also the following indorsement on the patent:

"Recognized by me October 23, 1906. E. V. Harry Goode 33 (degree) Supreme Council Spain."

Thomson had been a Mason in Scotland. In 1881 he came to America and in due time became an American citizen. In 1886 or 1887 he returned to Scotland, where he remained until 1898. He was a student of Masonry, learned in its history, traditions, and customs. Before leaving Scotland he took a demit from the Scottish Lodge. Taking up his residence in Idaho upon his return from Scotland, he became a member of the King Solomon Lodge, No. 17 of the Grand Lodge of Idaho. In 1906 he took a demit from that lodge. Thomson was the head of the Confederated Supreme Councils and of the American Masonic Federation, and had charge of the work of these two corporations. He was the guiding genius and master mind in the operation of these institutions.

Defendant Bergera had nothing to do with the organization of the American Masonic Federation, but was one of the organizers of the Confederated Supreme Councils of American Masonic Federation, and occupied the exalted position of Grand Almoner (whatever that may be). He had been in business at Diamondville, Wyo., and there became a member of the local lodge of the American Masonic Federation, taking the first three degrees, and afterwards the fourth to the thirty-second. He had correspondence with Thomson regarding the establishment of a lodge at Helper, Utah. Receiving a circular sent out by the Grand Lodge of Utah, branding the Diamondville Lodge as spurious, he took the matter up with the Grand Lodge of Utah, and tried to make some investigation. Afterwards, in 1913, he went to Europe, and claims to have visited the Grand Council of Rites in Scotland. Bergera came back and was active in the work of the organizations. He held the office of Grand Treasurer General. There is little serious dispute as to the facts.

[1] Many assignments of error are urged. Both defendants raise the question that the evidence was not sufficient to warrant the submission of the case to the jury or to sustain the finding of the jury. This requires a review of the evidence. The case is not limited merely as to alleged false representations as to rights to confer degrees acquired from the Grand Council of Rites of Scotland, either directly through Thomson or through the Supreme Council of Louisiana by way of the Polar Star Lodge, back by way of France to the Mother Kilwinning Lodge of Scotland, but likewise whether there were false representations as to what could be done under these alleged grants of power, and as to what the parties who received such degrees had a right from the representations to believe they were securing along Masonic lines.

The evidence is full of instances where Thomson particularly, and at times the other defendants, represented that they had a charter of authority from the Supreme Council of Louisiana to confer the craft degrees. The defendants were engaged in publishing pamphlets known as "The Universal Free Mason," and also one entitled "Who is Who in Masonry, and Why I am a Scottish Rite Mason." The latter publication has the fac simile signatures of the convicted defendants on the title page. Exhibit No. 14 in the record is one issue of this pamphlet, and on page 8 appears the following:

"On September 14, 1906, Joseph N. Cheri, Supreme Grand Commander of the Supreme Council of the Western Hemisphere, located at New Orleans, Louisiana, granted a charter of authority to M. McB. Thomson (himself being a member of the Supreme Council, and also Grand Representative of the Grand Council of Rites of Scotland) to form craft or symbolic Grand and subordinate lodges of Masons, and by virtue of that charter and also as a representative of the Supreme Council of Louisiana, he (Thomson) granted a charter to the Grand Lodge of Inter-Montana. Thus on the 9th day of January, 1907, the Grand Lodge 'Inter-Montana' received its Masonic charter."

This exhibit plainly states that Jos. N. Cheri, Supreme Grand Commander of the Supreme Council of the Western Hemisphere, located at New Orleans, granted a charter by authority of M. McB. Thomson to form craft or symbolic Grand and subordinate lodges of Masons. This was a publication that was sent broadcast to the members, and undoubtedly was used in influencing parties to become members. It was likewise represented in lodges by Thomson—also through his magazines, and in private—that authority to confer the craft degrees came from the Supreme Council of Louisiana. Witness Ransom, referring to witness Perrot's letter to Government Inspector Price, in which the claim was made that the power to confer the craft degrees had been conferred by indorsation on the patent of Thomson, stated:

"I had heard Mr. Thomson make the statement in open lodges, lectures, public lectures that we had conducted, that he was working directly under a charter from the Supreme Council of Louisiana."

In a speech made at Detroit to the members, Mr. Thomson said, referring to the chain of title for the craft degrees that the American Masonic Federation secured this authority from a patent by the Supreme Council of Louisiana, Louisiana by Polar Star, and back to Marseilles, France, and from there back to Mother Kilwinning Lodge of Scotland. The same representations were made by the organizers, as many of the witnesses testify. Afterwards, when there commenced to be rumors that the authority claimed did not exist, and when one of the members, Ransom, went to Louisiana to investigate and was expelled by Thomson, there seems to have been a shifting of the claim on the part of Thomson, and he then made claim that the authority to confer the craft degrees came directly from the Grand Council of Rites of Scotland, through the Rites of Mizraim and Memphis, and this rather amusing and significant situation is presented in Exhibit No. 33, being a copy of "Who is Who in Masonry." On page 8 is stated exactly what appears in Exhibit No. 14, heretofore set forth, an issue of "Who is Who is Masonry, and Why I am a Scottish Rite Mason," and interpolated on page 32 of Exhibit No. 33 is the following:

"The Grand Council of Rites of Scotland had within its bosom in addition to the native Scottish Rite of XLVII degrees (the higher degrees of which alone it controlled) the Rites of Mizraim of 90, Memphis of 95, and the Franco-Scottish of 33d in all their degrees of these rites."

It was claimed that this had been published in a pamphlet circulated by the Supreme Lodge 12 years before, but Thomson was unable to verify this when a witness. Therefore in this one publication the right and authority to confer craft degrees is given as emanating from distinctly different sources. The alleged indorsation on the patent from

the Grand Council of Rites, signed by Peter Spence, did not purport to give any authority to confer the craft degrees. Thomson was skilled in Masonry. He had been a member of the lodge in Scotland, later expelled therefrom, had written articles on Masonry, and must have known full well that the indorsement of Cheri on the back of the patent conveyed no authority to grant the craft degrees. At least, under the evidence, a jury could have so found. His subsequent actions show that his confidence was not unbounded as to such authority, as when the trouble arose, due to the investigation of Ransom as to the authority from the Supreme Council of Louisiana, he attempted to secure a certificate from Geo. U. Maury, who was at that time the head of the Supreme Council of Louisiana, stating that Thomson had been granted the power to convey the symbolic degrees. Maury refused to sign such certificate, and the Supreme Council of Louisiana repudiated Thomson's authority. Attempts were then made to revive the Polar Star Lodge and to establish intimate relationship between the American Masonic Federation and the Supreme Council of Louisiana, but these all failed. Thomson, after the severance of relations between the Supreme Council of Louisiana and the American Masonic Federation, published an article in the "Universal Free Mason," repudiating the claim so often made in publications and in lodges and by organizations that the Supreme Lodge worked by authority of a charter granted to it by the Supreme Council of Louisiana. Unquestionably the evidence was sufficient to warrant a jury in finding that the claims of authority to confer craft degrees were false.

As to the higher degrees, authority to confer them, as we have pointed out heretofore, was alleged to come directly from the Grand Council of Rites of Scotland. It was asserted in the publications of Thomson's corporations, and by defendants generally, that this Council of Rites occupied a unique position among Masonic high degree bodies; that it was the parent of many and the offspring of none, the custodian and preserver of those legendary and philosophical degrees so dear to bygone generations of earnest and enthusiastic Masons; the only genuine source of Scottish Masonry in the higher degrees in the world; that the title traced back to Mother Kilwinning Lodge, among the oldest, if not the oldest, Masonic lodge in the world, and held in affectionate regard by Masons everywhere. They represented that no other organization had such a clear title, and that other orders claiming to be of high degree were founded "upon a composition of sand, and when a search is made for their foundation it rests on air." Through the organizers, in the lodges, and in publications it was claimed and represented that this Council of Rites was composed of the leading Masons of Scotland; that it had 28 councils scattered throughout Scotland, and was the most respected high degree body there; that it was in amity and affiliation with the majority of the high degree bodies throughout the world; that the best people belonged to it; that those who joined these Masonic associations could consider themselves as the very best in Masonry. There seems to have been no economy of encomium with relation to their organizations. The only fly in the ointment was that, while the joiners could travel anywhere in the world and be recognized

as Masons, exception was made as to the United States. This exception as to the United States, however, did not seem to prevent from joining those who were deluded by the high-sounding phrases and by the desire to array themselves in supposed Masonic costumes with emblems and designations of various kinds and descriptions, and solemnly participate in the rites of these lodges. One of the degrees conferred will illustrate the heights of sublimity to which the supposed Mason was elevated. We set out from page 202 of the record:

"To All Illustrious, Ineffable, and Sublime Free Masons, of Whatever Degree over the Surface of the Globe—Greeting: Know ye that our trusted, well-beloved, and illustrious brother, Arthur S. Bier, 32°, who has been before entered an apprentice, passed a fellowcraft, and raised to the sublime degree of a master Mason, was by us inducted into the degrees of Ark Mariner, Marked Master, Jacob's Wrestle, Secret Master, Perfect Master, Master through Curiosity, Provost and Judge, Superintendent of the Building, Grand Architect, Master of the Royal Arch, Perfect Mason of the Secret Vault, Excellent Mason, Super Excellent Mason, Prince Mason, Knight of the Rosy Cross Knight of the East and West, Order of the Scarlet Cord, Order of Brotherly Love, Prince of Babylon, Priest of the Sun, Priest of Eleusis, Knight of Death, Knight of the Brasen Serpent, Knight of Rome and Constantine, Knight of St. John, Knight of the Sepulchre, Knight Kadosh, House of Holy Wisdom or Priestly Order, the Mother Word or Royal Secret, and as such we recommend him to all knights, princes, and sublime Masons of our obedience, and pray all other Masons over the surface of the globe to recognize him.

"In testimony of the truth hereof we have issued these letters patent, subscribed them with our hands, and sealed them with the seal of our Supreme Grand Council. Done in the valley of Glasgow, in the kingdom of Scotland, this 1st day of the Hebrew month Hesvan, A. M. 5678, answering to the 17th day of October, A. D. 1917.

"Robert Jamieson,
"33 degree Grand Secy. of H. E."

Such a degree, with so many designations of supposed Masonic distinction and greatness, must have been among the best sellers on the Masonic market conducted by the defendants. A jury would be warranted in believing from the evidence that this organization, known as the Grand Council of Rites, had not existed from time immemorial; that it did not relate back to Mother Kilwinning Lodge; that it was a small body in Scotland, with very few members; that Spence, the very man who signed the patent to Thomson, repudiated and withdrew from it; that when the Grand Lodge of Scotland discovered some of its members had entered it, and they were cited to appear, there was a recantation and withdrawal from the organization on their part; that it was without any standing whatever, and its reputation among Masons of Scotland was that it was a fake organization, bestowing spurious degrees; that it had no temples or buildings or lodge halls of any kind; that it seemed to consist of Jamieson's dwelling quarters and the printing press engaged in the constant work of turning out diplomas and degrees. A jury must have found from the evidence that Thomson's degrees and diplomas would not be received in the regular lodges of Masons in Scotland. They would have been warranted, under the evidence, in finding that the whole Grand Council of Rites was a part of a fraudulent scheme to give a show of authority to Thomson and his codefendants in carrying out their purposes. Reid and Inglis, from Scotland, who testified in the case, had not heard of the Grand Council of Rites up to 1910 or 1911. Reid

also testified that he had gone through the minutes of the Mother Kilwinning No. O Lodge; that from the minutes it was apparent that it was nothing but a craft lodge, so there would be no authority from this lodge to grant the higher degrees. Thomson, on the stand, though pressed to do so, was unable to name any Scottish Masonic history in which the words "Grand Council of Rites of Scotland," appear, and he admitted also that it was not the only high degree body in Scotland. A jury could, of course, believe Thomson, that he honestly thought he had authority from the Supreme Council of Scottish Rites to convey the higher degrees; that he honestly believed that the representations made as to the power and authority given to members by virtue of their degrees administered by his corporations would give them the right throughout the world, outside of the United States, to be recognized and accepted in Masonic Lodges. These matters, however, were for the jury, and evidently the jury did not believe Thomson's version of the transaction, and under this record it would be difficult to understand how any jury could find that Thomson was acting honestly and in good faith.

As to Bergera, it is claimed that he was mere onlooker, and not a participant in any fraudulent scheme. In the opening statement to the jury counsel for Bergera made the following statement:

"Defendants concede that they organized these corporations which have been referred to in the evidence as the American Masonic Federation and as the Confederated Supreme Cuoncil; they readily concede that they practice what has been denominated Universal Masonry and that they organized Universal Masonic lodges, not only in this state, but in many other states and in other countries; and that they conferred the degrees of this Universal Masonry, and in doing this they used the mails. That is not in dispute. But it is disputed and controverted that the defendants did or undertook to perpetrate any fraud on anybody, and had not intended to defraud any one; that what they did they claimed and believed to be done honestly and above board, and claimed the right to use the mails, the same as accorded to any other citizen, and in so doing did not attempt to defraud nor did they defraud any one."

Bergera, as we have heretofore pointed out, did not assist in organizing the American Masonic Federation, but did assist in organizing the Confederated Supreme Councils. It is apparent, however, that the three defendants were regarded by their counsel as being engaged in a joint enterprise; but, disregarding this statment, the evidence was amply sufficient to warrant a finding as to Bergera's connection with the conspiracy, and as to his joint action with the other defendants in the use of the mails to carry out the same. The "Universal Free Mason" was publishd by the defendants at Salt Lake City, and was sent through the mails. It was prolific in statements calculated to deceive those aspiring to become Masons. His picture, together with that of Thomson and Perrot, appears on a fraternal greeting card sent out on New Years; likewise it appears with that of the other defendants in the book entitled "A Tabloid History of Free Masonry," Exhibit No. 18. His fac simile signature appears on the fly leaf of the booklet, "Who is Who in Masonry, and Why I am a Scottish Rite Mason." He was present at various lodge meetings with Thomson. He journeyed with him to California, when they dissolved Provincial

Grand Lodge. He testifies that he went to Europe to make an investigation. On that investigation he went to Kilmarnock, the supposed headquarters of the Grand Council of Rites, and claims to have attended one of its meetings there, and that 28 people were present beside himself. He did not visit the Grand Lodge of Scotland. Unless he went through Scotland with eyes and ears closed, he must have discovered that the Grand Council of Rites of Scotland was not what Thomson and Perrot and he were representing it to be. It would seem, had he been entirely innocent in the matter, that after his return from Scotland, and knowing of the situation as to the Grand Council of Rites, as he must have known, he would not have joined in further eulogy of the institution. The record fails to show that his actions and conduct with reference to the matters were any different subsequent to his return. The jury could well have believed that his trip to Europe, and his conduct upon his return in carrying on with the organization as in the past, were a part of the plan to still further advance the work in which the defendants were engaged of alluring innocent victims and profiting financially thereby.

It is claimed that Bergera, although he occupied the position of Treasurer General, did not receive the money paid in, but Perrot did. Perrot did not testify so no light was thrown upon the matter by him. Bergera did receive, according to his own testimony, some money from the Grand Secretary. The claim that he was not functioning as Treasurer General, and that it was a mere empty office, is hardly in keeping with what occurred at the Salt Lake City convention in 1919, when another man was elected treasurer, and Thomson then appealed to the members as to the necessity of retaining Bergera in that position, and that it would tie his hands to supersede him; that Doyle, the man elected, retired after Thomson's plea, and Bergera was then elected by acclamation. Bergera, it is true, had nothing to do with the organization of the American Masonic Federation, but for 12 years he had much to do with it, and with the Confederated Supreme Councils. This review could be carried to great lengths, as the record fairly teems with evidence of oft-repeated, fraudulent representations. Likewise attempts to keep all matters within the hands of defendants, as shown by the provisions of section 98 of the Constitution of the Confederated Supreme Councils preventing members from communicating with foreign Masonic powers without the consent of the Foreign Relations Committee; likewise a conspiracy between them, and the use of the mails to accomplish their design.

It would have been improper under this evidence to direct a verdict for any one of the defendants. The testimony was sufficient to support a verdict of guilty. Crumpton v. United States, 138 U. S. 361, 11 Sup. Ct. 355, 34 L. Ed. 958; Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Humes v. United States, 170 U. S. 210, 18 Sup. Ct. 602, 42 L. Ed. 1011; Brooks v. United States, 146 Fed. 223, 76 C. C. A. 581; Matthews v. United States, 192 Fed. 490, 113 C. C. A. 96; Moffatt v. United States, 232 Fed. 522, 146 C. C. A. 480; Looker v. United States, 240 Fed. 932, 153 C. C. A. 618; Crane v. United States, 259 Fed. 480, 170 C. C. A. 456; Pandolfo v. United States (C. C. A.) 286 Fed. 8. If the entire scheme,

as the jury evidently found, was not based upon honest belief and intention, then it was a colossal fraud, ingenious and subtle, preying upon the vanity of its victims, which it numbered by the thousands— a contender with the Cardiff giant for prominence in the realm of fakedom.

[2, 3] Assignment of error No. 2 is the same in both cases. It is predicated upon the court's refusal to give request No. 6, which is as follows:

"It is the law that, if any one undertakes to accomplish an end, or to do a certain thing, in an honest belief that what he is doing is right and proper, he cannot be convicted of a crime. It is important in this case to determine, first, whether the brand of Masonry advocated by Thomson was regular or not, and unless you find it to be established beyond a reasonable doubt that it was spurious, or clandestine, or irregular, then you must acquit each and every defendant, and, even though you should find it to be established beyond a reasonable doubt that the Masonry advocated by Thompson was spurious and clandestine, or irregular, still before you can convict either Thomson or any of the other defendants you must find it to be established by the evidence beyond a reasonable doubt that said defendants did not believe in the Masonry which they were advocating, and that they and each of them knew that it was spurious and clandestine. And defendant in this case, who acted in good faith, entertaining an honest belief that what he was doing was right and proper, should be acquitted by the jury."

The requested instruction includes one statement, at least, that is not the law, and this would justify the court's refusal to give it. The court did cover fully and clearly in its instructions the question of good faith or fraudulent purposes on the part of the defendants. There is no substantial cause for complaint as to the matter in this assignment.

[4] The fourth assignment of error in both cases refers to the charge of the court as follows:

"You will observe now from this recital, or these recitals that this is not a mere case of a dispute of title. That is involved in it but that is not all that is involved in it. It is not a mere case of the question as to whether or not they got power under this indorsement on this charter from Louisiana Council. Nor is it solely the question as to the standing or authority of the Council of Rites of Scotland. These questions are involved, but there are many other questions involved."

The question here raised is stressed throughout the argument. The theory of defendants is that they were not guilty if the organizations in question were what they purported to be—that is, had Masonic foundation and traced their title back as claimed. The court took the position that under the indictment, if the defendants' claims as to title and authority were true, nevertheless there could be such false and fraudulent representations as to make them liable criminally therefor. The government constantly maintained in the case that the title question is not all that is involved; that, even if the corporations organized and controlled by Thomson may trace back their authority to the Grand Council of Scottish Rites, or even to Mother Kilwinning Lodge, yet that there are false representations as to the authority and power of the corporations, and the indictment so charged; in other words, that representations are made as to what the parties securing degrees will get, when in fact they will receive no such thing. For instance,

the evidence shows that statements were made as to the antiquity of the Grand Council of Scottish Rites; that it was the oldest high degree body in the world; that all high degree bodies traced their origin from it; that it was a legitimate high degree body of repute and authority; that the doors of Masonry throughout the world (except the United States) were open to those who joined the Thomson organizations. If these things and other representations were false and fraudulent, then, even were the authority to confer the degrees established, there would still be false and fraudulent representations, and these representations, if fraudulent as to authority and power of these organizations, were equally as culpable as fraudulent representations as to title. The court was clearly within its rights, and exercised its duty in taking. that view of the matter under the indictment. This covers also assignments of error 6, 7, and 8 in case No. 6301.

[5] Assignments of error 6 and 7 in case No. 6291 present the same question as assignments 9 and 10 in case No. 6301, viz. the introduction of the oral opinion of the court in Scotland, known as the "Ormidale Opinion," Exhibit No. 153, and the judgment of said court, Exhibit No. 154. We think no error is here shown. No ground of objection is stated to these exhibits. With reference to them counsel stated, "I would like to make an objection at the proper time." It was suggested by the government's counsel that the questions of law might be argued in chambers. Later the court overruled the objection to these exhibits, No. 153 and No. 154. Nowhere do we find in the record what the objections were. It may have been on some absurd or untenable ground, or on a valid ground. This court is not informed by the record, and hence cannot, of course, consider the question raised by these two assignments.

[6-8] Assignment No. 8 (No. 6291) and No. 11 (No. 6301) relate to the introduction of a certain newspaper clipping from the Glasgow Herald, dated April 14, 1914. This exhibit is No. 145 and relates to the opinion of Lord Ormidale and the case in which that opinion was given. The court in its instructions placed a qualification upon the admission of this clipping and stated it was admitted, "not to prove the truth of the things that are in the exhibit, but simply that the jury may understand the things which were under discussion between the witness and Thomson at the time of that conversation, and will be considered only for that purpose, unless otherwise hereafter directed." On this very subject defendants' request No. 7 asked the court to give an instruction which contained the following language with reference to said exhibit:

"It cannot be considered by you for any purpose, except as it may explain and throw light upon the alleged conversation between Thomson and Cavitt, the witness for the government."

Defendants' counsel evidently considered in making this request that the exhibit might be admissible for that particular purpose. The court further, in his charge relating to this matter, said:

"Reflections in the article upon Jamieson could not be construed to in any manner affect the standing of any of these defendants, except in so far as they might bring to their knowledge what was charged against him,

in order to judge their subsequent conduct with reference to him and co-operation with him, if it was of any value at all."

With the limitation of the court's instruction, and in view of the fact that Thomson had full knowledge of this decision, as appears from the record, certainly no prejudice could be claimed as to him by its introduction. Bergera joined in the general objection made, that it was incompetent, hearsay, and in no wise binding on the defendants. No objection was made as to Bergera distinct from this general objection, but he joined in the objection that it was not admissible at all. As it was clearly admissible against Thomson, said objection is not availing as to any particular objection arising out of the claimed different situation of the defendant Bergera. Nor did Bergera ask for an instruction that the article should be considered only as to Thomson. We think there was no error arising out of this situation. What we have said as to these assignments covers also the question raised by assignment No. 3 in both cases.

[9] Assignment No. 10 (No. 6291) and No. 13 (No. 6301) relate to the question and answer of witness Maury. Maury had written a letter to Thomson in December, 1919, in which letter he used the expression "that among other things the American Masonic Federation owes its Masonic existence to the Supreme Council of Louisiana," and he was asked in what sense he used the expression in the letter. Over the objection of counsel for defendants, he was permitted to testify. In this we think there was error. The witness could not testify as to some undisclosed idea that he had in the use of the language which was in no way communicated to Thomson. The language was plain and unambiguous, and the objection should have been sustained. We refer to this hereafter.

[10, 11] Assignments of error 14, 17, 19, 20 and 22 (No. 6291), and 17, 21, 22, 23, 24, and 25 (No. 6301) relate to various questions asked and answered by witness David Reid. Reid was a Scotchman, who had made a life study of Masonry, and he was an expert on the subject. These questions relate to various matters concerning the Grand Lodge or craft lodges of Scotland, as to whether it was proper in these lodges to solicit members to join, as to what became of the money of the Grand Lodge of Scotland, as to the customs and practices of the Grand Lodge of Scotland, and other similar questions. It is urged by defendants that the American Masonic Federation and the Confederated Councils of the American Masonic Federation had nothing to do with the Grand Lodge of Scotland; that Thomson made no claim that he had authority from the Grand Lodge of Scotland to do what he did in organizing or operating the American Masonic Federation, or any other lodge organized by him; and hence that it was wholly immaterial what the constitution or the customs and practices of the Grand Lodge of Scotland were. However, it is apparent from the record that defendants did claim connection with the Grand Lodge of Scotland. Their magazine proclaimed that:

"The organizers of the A. M. F. are all, or nearly all, members of the oldest craft lodges in Scotland, working under the obedience of the Grand Lodge of Scotland; especially is this so of the editors of this magazine."

Mr. Thomson on the stand endeavored to explain this as a mistake in tense. The record amply shows that such representations were made as to connection with the Grand Lodge of Scotland. One of the magazines states that Thomson was a life member of the craft lodge in Scotland holding under the Grand Lodge of Scotland. Many times it was claimed that the title was traced back to Mother Kilwinning No. O, one of the older craft lodges in Scotland, and it was unquestioned that Mother Kilwinning was a daughter lodge of the Grand Lodge of Scotland. In view of all of this, there was no error in showing by Reid what the customs and practices of the Grand Lodge of Scotland were, as a basis for comparison with the customs and practices of the Thomson lodges, and that the rules and practices of the Thomson lodges were in violation of the practices of Mother Kilwinning Lodge. Further, it was continually represented that the diplomas from the Thomson lodges would be received abroad, and that the membership of these lodges were in amity with the Grand Lodges of Europe. The record warrants the assertion that the followers of Thomson were led to believe that they were getting the same Masonry as was practiced in Scotland. Reid was competent to testify to such matters as matters of historic interest, and by reason of his familiarity with Masonry in Scotland. The question asked him, Was Jamieson expelled by the Grand Lodge of Scotland? and the answer thereto, it is claimed were immaterial. There was no error, because, when Jamieson was expelled, he lost his Masonic standing and could thereafter exercise no Masonic authority. It was Masonic death. This Thomson admitted in his testimony. Therefore, if Jamieson was expelled, he could not with any authority thereafter sign the high degree diplomas which defendants were disposing of. Hence said expulsion was a material matter, and bore on the general situation.

As to the question asked Reid, whether Mother Kilwinning No. O ever granted the chartering power to any of her daughter lodges, it is sufficient to say that this was not a matter that could be proved by producing any particular charter. It was a matter of historic fact concerning which Reid, as a member of Mother Kilwinning Lodge No. O since 1875, was qualified to speak. He testified that he was familiar with the entire written history of that lodge. He testified as an expert upon a historic fact. It was not a question of what were the contents of some charter, but it was a question of lodge history, and we think there was no error there. The foregoing covers also assignments of error 15 and 16 (No. 6291) and 18 and 19 (No. 6301) relating to the constitution, records, and other matters concerning the Grand Lodge of Scotland.

[12] Assignments of error No. 24 (No. 6291) and No. 27 (No. 6301) relate to permitting the witness Inglis to answer the following question:

"The litigation referred to in Government's Exhibit 145 (the newspaper clipping), was the amalgamation confirmed?"

The opinion of Lord Ormidale, Exhibit 153, being in the record, and likewise the judgment filed of record, Exhibit 154, the confirmation of the amalgamation was shown by these documents, and there could be

no prejudice by showing what was already in the case. The same matter also was in the record in the conversation between Cavitt and Thomson.

[13] Some other errors are assigned. We have considered them, and, without discussing them specifically, are satisfied that, even if erroneous, no prejudice resulted. There was error in the question propounded to Maury and the answer thereto, hereinbefore referred to; but the same, we think, under the whole record, was not prejudicial and did not affect any of the substantial rights of defendants.

[14] Section 269, c. 48, p. 1181, 40 Stat. (Comp. St. Ann. Supp. 1919, § 1246), provides as follows:

"All of the said courts shall have power to grant new trials, in cases where there has been a trial by jury, for reasons for which new trials have usually been granted in the courts of law. On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

Under this section it is our duty to examine the record without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties. We have done so, and are satisfied that the evidence was abundant to justify the finding of guilty by the jury. It was fairly presented to them whether the defendants were acting in good faith, or whether they were perpetrating a scheme by the use of the mails for profit by commercializing a well-known and highly esteemed fraternal order. No errors in the record affect the substantial rights of the parties.

As to both defendants the judgment of the trial court is affirmed.